COURT OF APPEALS
DECISION
DATED AND FILED

November 29, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1227-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2017CF2050

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

CARTRELL ROMEL KIMBLE,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: JEFFREY A. CONEN and MICHELLE ACKERMAN HAVAS, Judges. *Affirmed*.

Before Brash, C.J., Donald, P.J., and White, J.

¶1 WHITE, J. Cartrell Romel Kimble appeals his judgment of conviction entered upon a jury's verdict for first-degree recklessly endangering safety while armed, as well as the order denying his motion for postconviction

relief without a hearing. Kimble argues that the State improperly vouched for two of the witnesses in its closing argument, which violated his right to due process and constituted plain error. He also argues that he was denied effective assistance of counsel because his attorney did not object to the prosecutor's improper closing argument. We conclude that the prosecutor's argument was a reasonable inference drawn from the evidence adduced at trial, that no plain error occurred, and that Kimble failed to show his attorney's performance was deficient or prejudicial in failing to object. Accordingly, we affirm.

## BACKGROUND

¶2    This case arises out of a shooting related to a drug deal in August 2012 in Milwaukee, in which two men were shot—one died and the other survived. According to the criminal complaint, Kimble and a co-actor, both wearing t-shirts as masks over their faces, approached a porch on North 50th Street. There were at least four people on the porch; Kimble and his co-actor allegedly shot and killed Leneir Johnson and shot a second man, D.H., whose injuries were not life threatening.[1]

¶3    In April 2017, Kimble was charged with first-degree intentional homicide as a party to a crime for the death of Leneir Johnson and first-degree recklessly endangering safety while using a dangerous weapon as a party to a crime for the shooting of D.H. The case proceeded to a jury trial in April 2018. During the trial, multiple witnesses testified about the events that transpired,

---

[1] The complaint also alleged that the shooting occurred in retaliation for Johnson and an associate, R.G., stealing marijuana from a person, R.D., who had previously sold "bad" cocaine to persons connected to Johnson and R.G.; the following year, R.G. shot and killed R.D. Actions against Kimble's co-actors in these matters were severed and we address them no further.

including providing information about the crime scene and the weapon casings recovered; however, there was no physical evidence such as DNA or fingerprints that linked Kimble to the crimes. Although numerous witnesses testified to seeing the shooting and the men running from the scene, the prosecutor offered in an opening statement that the jury would hear from two witnesses who would "identify [Kimble] after the shots." Those two witnesses were C.J., hereinafter, "Cory" and D.H., hereinafter "Derek."[2] We recite relevant details from each man's testimony.

¶4 Cory's testimony on direct examination began with, "Is it safe it say you don't want to be here, correct?" To which Cory replied, "Yes." The prosecutor then asked if he was required to testify because of a subpoena. Cory replied, "I guess." Cory testified that he recalled hearing gunshots near North 51st Street and West Clarke Street on August 24, 2012, although he could not recall the time. After hearing the shots, he saw two men running through a gangway between two houses. He did not recall what the men looked like.

¶5 Cory testified that he spoke with a Milwaukee Police Department detective in April 2014; however, his memory was affected by a car accident in 2016. Immediately before trial, Cory met with police to refresh his recollection of his interview from approximately four years earlier. Cory testified that he did not recall telling the detective that he saw the individuals running in the gangway and

---

[2] We note that while the surviving shooting victim and one of the witnesses have the same initials, they are different people. For ease of reading, we refer to the witnesses by pseudonyms. *See* WIS. STAT. RULE 809.86 (2019-20).

All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

recognized one of them as a man he knew as "Trell." He acknowledged his signature on trial exhibit 52, a supplemental report on a photograph array identification form dated April 10, 2014. He did not recognize the individual photographs from the photograph array, exhibits 53 through 58; he acknowledged his initials on exhibit 55, the photograph of Kimble, but he did not recall marking the photograph.

¶6 Cory testified that he recalled the men running in the gangway between two houses, that they had their respective right hands under their shirts, consistent with concealing a gun, but that he did not see the weapons. He did not recall telling police that one of the men said, "What's up?" as he ran past, nor did he recall recognizing the voice as belonging to Kimble. He recalled that the men ran westbound through North 51st Street, through another gangway between houses on the other side of the street, and then out of his sight. He recalled hearing the sirens shortly after seeing the men running and that he heard that someone died as a result of the incident but he did not know who the victims were.

¶7 When questioned about his recall, Cory stated: "I was young at the time. I was scared. You know what I'm saying, and everything that I might have told the police, it could have been true, might not have been true … all of that was told to me from another person." Cory stated that with the questioning by the prosecutor "going on and on … it's coming to me." He realized that "somebody else told" him Kimble's name and the details of the day. The prosecutor asked him if he did not come forward with Kimble's identification in 2012 because he was scared. Cory replied, "No, it isn't that I didn't want to come forward. I had nothing to do with the situation." Cory stated that he did not see the face of the men running in the gangway.

¶8 The State called Detective James Hutchinson, who testified that in the course of an investigation, a person told him that Cory had information about the August 2012 homicide of Johnson. The detective testified that Cory told him about seeing two men running in the gangway between two houses after the shooting, recognizing Kimble, and that he was on his porch having a family barbecue at the time of the incident. Cory identified Kimble in a photograph array, signed the identification form, and put his initials on the back of the photograph of Kimble.

¶9 The second witness at issue is Derek. He also was asked if he wanted to be in court testifying, to which he answered, "No." He testified that on the night in question in August 2012, he was taking out his garbage from his home on North 51st Street and he heard gunshots. Derek was by his garage and he saw two men running in the gangway between his house and the next. He saw that both of the men were wearing dark clothing, but he did not see their faces. Derek testified that he saw a gun and that one person said his nickname, "and by them saying my name, it made me kind of, like, cautious a little bit as to who could have said that." He recalled the phrasing as "[Coach], don't say nothing."[3] He recalled it was a hot day, his three kids and his mother were outside, and he was concerned for them. Because the men were running toward the front of his house, and he was still in the back by the garage, he thought he yelled something like "Oh, okay, put them guns up because my kids are in the front." Derek did not see the men's faces and he did not recall telling a police detective that the men's t-shirt face masks were pulled down when he first saw them.

---

[3] To protect the witness's confidentiality, we also refer to his nickname by a pseudonym.

¶10    The prosecutor asked, "do you worry for your safety because you're testifying in this case?"  He responded:

> I'm kind of nervous because at the same time it's my life. My life is important before anybody in this court so that's why I'm in court today.  My life is important.  Everybody else, you all just looking and I have to live this.  I gotta still take care of my kids.  I still gotta go out there and feed them and make sure they're straight and watch over my back.  If anything ever was to happen, you all go home, I will be in fear.

¶11    Derek testified that he did not recall telling the detective that he recognized the running men, nor did he recall telling the detective that he could see both men were carrying guns.  He did not recall the caliber of their weapons, although he did remember seeing one of the guns was black.  Derek recalled that it was surprising that one of the men saw his face, recognized him, and called out to him using his nickname.  Derek did not remember telling the police that he saw the men's faces, and stated he did not tell the detective he saw their faces "because if I told the police that, we wouldn't be in 2018 right now with this prosecution if I told the police that.  We wouldn't be here today.  That was six years ago or four years ago  ….  This would have been over with."

¶12    Derek testified that he "was being honest" when he met with police in April 2014 and he was "being honest today" in court.  The prosecutor stated, "I understand that you absolutely don't want to be here today and that you're hesitant to talk about this."  Derek replied, "I'm not hesitant.  I said what I had to say and that was basically it, you know."  He stated he did not come forward in 2012 because he did not know who the men were that he saw running.  Derek stated he was drawn into the case because his neighbor, Cory, talked to the police.  He did not recall ever speaking about the incident with Cory, whom he identified in a photograph.

¶13     Derek testified that he participated in a photograph array identification with the police and recognized Kimble. He denied that he recognized Kimble as the man running in the gangway that day, but instead he "knew him from the neighborhood." Derek could not say that it was Kimble whom he saw in the gangway pulling his t-shirt off his face and saying, "Don't say anything, [Coach]." He acknowledged that on the photograph array identification form, it showed that he signed indicating that he identified a photograph of Kimble as the person running from the scene with a handgun. Derek testified that he did not recall trying to refuse to sign the backs of the photograph in the photograph array identification. He told the detective that he was not comfortable signing them because while he knew the people, he did not know if the people did anything.

¶14     Derek testified that he was close friends with Johnson and held him as he died at the scene of the shooting. He told the detective that he did not talk to the police in 2012 because he had custody of his children and he had to protect them. He stated that he would keep things to himself if he did not know something.

¶15     The State called Detective Timothy Graham. He testified that the police had contact with an individual who recommended they talk to Cory and Derek. He testified that he spoke with Derek in 2014, during which he was "very cooperative." He stated that Derek told him that he heard fifteen or sixteen gunshots, he saw two men running in the gangway between his house and the next, then the men began to pull their t-shirt masks off of their faces as they ran toward him, but pulled them back up when they saw him. Derek told the detective that both men were carrying handguns and he yelled at them to put the guns away because he had kids out there. He indicated that he heard one of the men say,

7

"[Coach], don't say nothing," he again told them to put the guns away, and the men ran away.

¶16    Detective Graham testified that Derek stated that he thought he could identify the two men running in the gangway—one of them not only by face, but by voice as someone from the neighborhood. Derek told the detective that only about ten people knew him as "[Coach]," which was part of the reason he believed he recognized the voice. Derek told the police he had not come forward because he was raising three children in the neighborhood and he had to deal with the neighbors on a daily basis.

¶17    Detective Graham recounted the photograph identification array procedures employed when Derek identified Kimble from the double blind folder photo array. The detective stated that Derek was "very certain" of his identification of Kimble. However, Derek did not want to put his initials on the back of the photograph of Kimble because "[h]e indicated that he felt like he had done too much even making an identification because he didn't want to be involved in this. So he refused to sign the back of the photo[graph]."

¶18    During cross-examination, Detective Graham testified that it was not known until the trial that Derek considered Johnson, the homicide victim, to be his best friend, or that Cory lived in the upper unit of the same residence.

¶19    The next relevant event occurs during the State's closing arguments. The prosecutor walked the jury through the details of the shooting, the testimony of witnesses other than Cory and Derek, and Kimble and his co-actor's alleged paths away from the shooting. The prosecutor then discussed Derek and Cory's testimony. The prosecutor stated that Derek and Cory were "recanting witnesses"; however, they were "really important witnesses" because their recantation "speaks

to the reliability of their identification of this defendant." The prosecutor pointed out that both Derek and Cory were "not strangers" with Kimble, but providers of an "identification of a known subject, someone who had been seen before by both of the eyewitness[es]."

¶20 Discussing the recantation, the prosecutor pointed out that "[n]either one of them wanted to come forward" with information about the shooting. "They were very terrified and scared." Even though Derek stated that Johnson "was his best friend, someone he loved very dearly[,] … he didn't want to come forward and point out his killer because he was afraid[.]" When the police spoke with Cory in 2014, he gave "a complete, voluntary, and clear and detailed account of what he saw. There's no reason to doubt what he told the police; there's no information here to suggest there wouldn't be reliability to that statement." However, Cory "really wanted to backtrack off of the statements he gave" to the police. "[H]e doesn't want to say that he actually saw the face of this individual because he's frightened and he was a young boy."

¶21 The prosecutor then discussed Derek who was described as "not cooperative," but whose "testimony was very powerful in a lot of regards." Derek "did not want to identify this defendant in court because he was afraid. That was abundantly clear." The prosecutor then told the jury to apply "your common sense and looking at what motive an individual would have" to recant testimony. "You've got scared witnesses that don't want to be the person fingering a murderer in court when they've got to live in that neighborhood still, when they've got to take care of their children still. They don't want to point out the person who did this crime."

¶22    The prosecutor stated, "[s]o those identifications out of those photo[graph] arrays are highly reliable" and they support the testimony of other witnesses.  The prosecutor acknowledged that there was "no evidence that Mr. Kimble actually threatened anybody ….  But it's the belief that the witness would have about something, and the culture of not snitching that comes into play."

¶23    During deliberations, the jury asked for a copy of Derek's testimony, to which the court responded that the jurors must rely on their collective memories.  Ultimately, the jury returned a not guilty verdict on the first-degree intentional homicide charge, but guilty on the first-degree recklessly endangering safety charge.  In May 2018, the court sentenced Kimble to twelve years of initial confinement and five years of extended supervision.

¶24    Kimble appeals.

**DISCUSSION**

¶25    Kimble argues that the State improperly vouched for the reliability of the out-of-court identification of Kimble by Derek and Cory.  He contends the prosecutor's vouching asked the jury to rely on facts not in evidence, which violated his due process rights and constituted plain error, which now requires a new trial.  Further, he argues that his counsel was ineffective for failing to object to the prosecutor's closing argument.  He finally asserts that the circuit court erred when it denied his postconviction motion without a hearing.  We reject all of Kimble's arguments.

*I.    Vouching*

¶26    Kimble argues that the prosecutor violated his due process rights by improperly vouching for the out-of-court identification of Kimble by Derek and

Cory. Whether due process has been violated is a question of law, which we review independently. ***State v. Bell***, 2018 WI 28, ¶8, 380 Wis. 2d 616, 909 N.W.2d 750. Kimble did not object to the State's alleged vouching—this failure is the basis of his ineffective assistance of counsel claim. However, his claim of a due process violation may be reviewed under the plain error doctrine. "The plain error doctrine allows appellate courts to review errors that were otherwise waived by a party's failure to object." ***State v. Jorgensen***, 2008 WI 60, ¶21, 310 Wis. 2d 138, 754 N.W.2d 77; WIS. STAT. § 901.03(4). This doctrine is employed "sparingly." ***Bell***, 380 Wis. 2d 616, ¶12. We will only remedy fundamental errors under this doctrine when they are "obvious and substantial[.]" ***Id.***, ¶8 (citation omitted). "[T]he existence of plain error will turn on the facts of the particular case." ***State v. Mayo***, 2007 WI 78, ¶29, 301 Wis. 2d 642, 734 N.W.2d 115.

¶27 During closing arguments, an attorney "may comment on the evidence, detail the evidence, argue from it to a conclusion, and state that the evidence convinces him or her and should convince the jurors." ***State v. Adams***, 221 Wis. 2d 1, 19, 584 N.W.2d 695 (Ct. App. 1998). An attorney "is allowed considerable latitude in closing arguments, with discretion given to the trial court in determining the propriety of the argument." ***State v. Burns***, 2011 WI 22, ¶48, 332 Wis. 2d 730, 798 N.W.2d 166. An attorney may not "suggest that the jury arrive at its verdict by considering factors other than the evidence." ***Adams***, 221 Wis. 2d at 19.

¶28 The question before us is whether the prosecutor's commentary violated Kimble's right to due process in a fair trial. "To determine whether a prosecutor's comments constitute a due process violation, the court must ask whether the statements 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" ***Jorgensen***, 310 Wis. 2d 138, ¶40

11

(citation and one set of quotations marks omitted). We consider "the significance, timing, repetition, and manner" of statements presented to the jury to determine whether they improperly affected the trial. *Id.*, ¶44. Here, the prosecutor's statements occurred in closing arguments, within an analysis and review of the evidence of the case.

¶29 Kimble argues that the prosecutor's commentary on Derek and Cory's testimony during closing arguments introduced facts not in evidence. He contends that it was improper for the prosecutor to state that the reason why Derek and Cory did not make an in-court identification of Kimble as a man they each saw running from the shooting was because they feared retribution from Kimble. The prosecutor called them "recanting" witnesses and argued that "[n]either one of them wanted to come forward" with information about the shooting. The prosecutor explained that "[t]hey were very terrified and scared." The prosecutor contrasted the police testimony about each man's cooperation during interviews in 2014 with Derek's concerns for his life and children and Cory's backtracking while on the witness stand.

¶30 Kimble further contends that the prosecutor improperly vouched for Derek and Cory's credibility because there was no direct evidence that either man was refusing to make an in-court identification because of fear. Kimble points out that Cory attributed his faulty memory to an accident and Derek denied being "hesitant" to testify. Kimble asserts that neither man's testimony established a direct connection between his inability to offer an in-court identification with his fear of Kimble. Kimble argues that the prosecutor offered reasoning without a

basis for their recantations.[4]  He objects to certain phrasing used by the prosecutor, such as that Cory "doesn't want to say that he actually saw the face of this individual because he's frightened and he was a young boy," and that it was "abundantly clear" that Derek "did not want to identify this defendant in court because he was afraid."

¶31  Conversely, the State argues that the prosecutor's comments on the reliability of the out-of-court photograph array identifications were not improper. Further, the State argues that it was not improper for the prosecutor to state that Derek and Cory were afraid to identify Kimble.  The prosecutor's comments were derived from the witnesses' testimony as well as Detective Graham's testimony that it was "very common in Milwaukee" for witnesses to be hesitant to come forward because of "retaliation."  The prosecutor acknowledged that there was "no evidence that Mr. Kimble actually threatened anybody[.]"  However, in the end, the prosecutor offered a reasonable inference derived from the evidence presented, stating that "the culture of not snitching … comes into play" when considering inconsistencies in the identification testimony.  The State contends that these were not improper comments.  *See Adams*, 221 Wis. 2d at 19.

¶32  The State argues that the record reflects that Derek and Cory's own testimony supported the prosecutor's position that their inconsistency was out of fear.  The State asserts that the prosecutor asked the jury to form a reasonable inference from the testimony it heard.  Our examination of the record shows that

---

[4] In his reply brief, Kimble appears to concede that Derek's testimony expressed fear of retaliation—Derek's testimony specifically mentioned worrying about his children and his need to "watch over [his] back.  If anything ever was to happen, you all go home, I will be in fear." However, Kimble argues that the prosecutor ascribed that motivation to Cory as well, without similar support in the record.  This concession does not change our analysis.

there was sufficient evidence presented to the jury to support a reasonable inference of fear of retaliation. We reject Kimble's argument that the prosecutor asked the jury to rely on evidence not in the record. *See id.*

¶33 We are not convinced that the prosecutor's comments were objectionable. The prosecutor elicited testimony from both Derek and Cory about each man's reluctance to testify at trial. In closing arguments, the prosecutor "did an exhaustive review of the evidence" and from that evidence, the prosecutor commented on Derek and Cory's credibility as witnesses. *See State v. Lammers*, 2009 WI App 136, ¶24, 321 Wis. 2d 376, 773 N.W.2d 463. The prosecutor's comments on Derek and Cory's motivation derived from the evidence within their testimony. The prosecutor did not bring her personal opinion into the case. *See Adams*, 221 Wis. 2d at 19. Upon examination of the record, we conclude that the prosecutor's closing argument did not infect the trial with unfairness, and did not violate Kimble's right of due process. *See Burns*, 332 Wis. 2d 730, ¶53. Accordingly, we conclude that Kimble has not shown that plain error occurred.[5]

## II.     *Ineffective assistance of counsel*

¶34 We now turn to Kimble's claim of ineffective assistance of counsel for failing to object to the prosecutor's comments in closing argument. The State contends that our inquiry begins and ends with whether the circuit court erred when it denied Kimble's motion without conducting an evidentiary hearing on his

---

[5] The State also argues that any improper comments would constitute harmless error in light of the totality of evidence against Kimble. "The burden is on the State to prove that the plain error is harmless beyond a reasonable doubt." *State v. Mayo*, 2007 WI 78, ¶29, 301 Wis. 2d 642, 734 N.W.2d 115. However, we conclude that we need not reach the harmless error analysis because we have determined the prosecutor's comments were not improper.

ineffectiveness claim. *See **State v. Machner***, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979) ("[I]t is a prerequisite to a claim of ineffective representation on appeal to preserve the testimony of trial counsel."). A claim of ineffective assistance of counsel is preserved with testimony from an evidentiary hearing, which is only granted when a defendant asserts sufficient material facts to be entitled to relief. *See **id.***

¶35 "Whether a defendant's postconviction motion alleges sufficient facts to entitle the defendant" to a ***Machner*** hearing is a mixed question of fact and law. ***State v. Allen***, 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433. "A defendant is entitled to a ***Machner*** hearing only when his motion alleges sufficient facts, which if true, would entitle him to relief." ***State v. Sholar***, 2018 WI 53, ¶50, 381 Wis. 2d 560, 912 N.W.2d 89 (citation omitted). Whether the motion alleges sufficient material facts to entitle a defendant to relief is a question of law that we review independently. ***State v. Bentley***, 201 Wis. 2d 303, 310, 548 N.W.2d 50 (1996). "However, if the motion does not raise facts sufficient to entitle the defendant to relief, or if it presents only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief, the circuit court has the discretion to grant or deny a hearing." ***State v. Ruffin***, 2022 WI 34, ¶35, 401 Wis. 2d 619, 974 N.W.2d 432.

¶36 The circuit court determined that Kimble failed to allege sufficient material facts to demonstrate ineffective assistance of counsel. Therefore, the court exercised its discretion to deny Kimble's motion without a hearing. A claim of ineffective assistance of counsel requires a defendant to show both that counsel's performance was deficient and that the defendant was prejudiced by counsel's performance. ***Strickland v. Washington***, 466 U.S. 668, 687 (1984). "Counsel's conduct is constitutionally deficient if it falls below an objective

standard of reasonableness." ***State v. Thiel***, 2003 WI 111, ¶19, 264 Wis. 2d 571, 665 N.W.2d 305.  To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." ***Strickland***, 466 U.S. at 694.  If a defendant does not making a showing under one of the tests, we need not address the other.  *See* ***State v. Johnson***, 153 Wis. 2d 121, 128, 449 N.W.2d 845 (1990).

¶37    We concluded above that the prosecutor's comments were not improper.  Accordingly, we now conclude that if counsel had objected during the prosecutor's closing arguments, the objection would not have been meritorious.  In fact, the circuit court in its postconviction decision stated that the prosecutor's closing arguments were "perfectly reasonable" and "if counsel had objected, it would have been overruled."  Counsel's performance is not deficient for failing to make a meritless objection.  *See* ***State v. Sanders***, 2018 WI 51, ¶18, 381 Wis. 2d 522, 912 N.W.2d 16.  Therefore, Kimble has not made a showing of deficient performance.

¶38    Further, Kimble has not made a showing of prejudice.  Before deliberations, the jury was instructed by the circuit court in relevant part:

> You jurors are the judges of the credibility of the witnesses and of the weight of the evidence.  Remarks of the attorneys are not evidence.  If the remarks suggest certain facts not in evidence, disregard the suggestion.  Consider carefully the closing arguments of the attorneys, but their arguments, conclusions, and opinions are not evidence.  Draw your own conclusions from the evidence and decide upon your verdict according to the evidence under the instructions given to you by the [c]ourt.

Juries are presumed to follow the instructions of the court. *State v. Miller*, 2012 WI App 68, ¶22, 341 Wis. 2d 737, 816 N.W.2d 331. This "alleviate[s] the likelihood that jurors placed any significant weight on the prosecutor's comments other than the weight that came from their own independent examination of the evidence." *Id.* Accordingly, we are satisfied that even if the prosecutor's statements in closing arguments had been improper in some manner, there was not a reasonably probability of a different result—even if Kimble's counsel had objected contemporaneously and the circuit court would have instructed the jury to disregard the prosecutor's comments. We conclude that Kimble has failed to make a showing of deficient performance or prejudice; accordingly, he has failed to prove his claim of ineffective assistance of counsel.

¶39 When we consider the record as a whole, it conclusively demonstrates that the State's closing argument was not improper and Kimble's claim of error is without merit. A *Machner* hearing "is not mandatory if a defendant's motion presents only conclusory allegations or if the record as a whole conclusively demonstrates that the defendant is not entitled to relief." *Ruffin*, 401 Wis. 2d 619, ¶38. Therefore, we conclude that the circuit court's denial of Kimble's request for a *Machner* hearing was within its discretion.

## CONCLUSION

¶40 For the reasons stated above, we conclude that Kimble has failed to show plain error in his conviction arising from a due process violation or ineffective assistance of counsel for failing to object to the prosecutor's statements. We affirm.

*By the Court.*—Judgment and order affirmed.

Not recommended for publication in the official reports.