COURT OF APPEALS
DECISION
DATED AND FILED

October 24, 2023

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP1840-CR**

STATE OF WISCONSIN

Cir. Ct. No. 2018CF147

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

DEMETRUS PICKENS,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Outagamie County: CARRIE A. SCHNEIDER, Judge. *Affirmed.*

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Demetrus Pickens appeals a judgment, entered upon a jury's verdicts, convicting him of attempted first-degree intentional

homicide, party to a crime of attempted first-degree intentional homicide, and possession of a firearm by a felon. Pickens also appeals the order denying his motion for postconviction relief. Pickens argues that his trial counsel was ineffective with respect to the admission of the trial testimony of two law enforcement officers expressing what Pickens claims were improper opinions on the credibility of other witnesses. Pickens alternatively asserts that admission of the testimony constituted plain error. We reject Pickens' arguments and affirm the judgment and order.

## BACKGROUND

¶2      Pickens, along with his brother, Timothy Mitchell, and their friend, Kareem Wallace, were involved in an argument with Terral Wallace and others at an Appleton bar. Tony[1] joined in the dispute and ultimately punched Mitchell in the face. Another bar patron kicked Mitchell while he was on the ground. During the physical altercation, Kareem handed Pickens a handgun, and Pickens unsuccessfully attempted to fire the gun in the direction of the man who had kicked Mitchell. When Pickens attempted to fix what appeared to be a malfunctioning gun, people around him began running out of the bar.

¶3      As Pickens attempted to manipulate the gun, Antonio Lewis and Rachel Greiner tried to stop him. After Lewis and Greiner were unable to restrain him, Pickens walked outside, followed by Kareem. In the parking lot, Pickens again attempted to discharge the gun. When the weapon did not fire, Pickens handed it to Kareem who pointed the gun toward Tony, who was standing behind

---

[1] Pursuant to the policy underlying WIS. STAT. RULE 809.86(4) (2021-22), we use a pseudonym instead of the victim's name.

a vehicle. Kareem then discharged a total of four rounds in Tony's direction. Although Tony was not shot, law enforcement recovered spent casings from the parking lot and three fired bullets from inside the vehicle Tony was ducking behind. Surveillance video from the bar captured the entire incident, both inside and outside the bar.

¶4    Upon hearing via social media that his name had been mentioned with respect to the shooting incident, Pickens went to the police station to speak with investigators "to clear his name." During his interview with Detective Dustin Yule, Pickens' story changed several times. Pickens was ultimately charged with two counts of attempted first-degree intentional homicide—one count as party to a crime—and one count of possession of a firearm by a felon. A jury found Pickens guilty of the crimes charged, and the circuit court imposed concurrent sentences totaling twenty-five years, consisting of fifteen years of initial confinement followed by ten years of extended supervision.

¶5    Pickens filed a postconviction motion for a new trial, alleging ineffective assistance of his trial counsel and, alternatively, plain error with respect to the admission of certain trial testimony. The court denied the motion after a *Machner*[2] hearing, and this appeal follows.

## DISCUSSION

¶6    Appellate review of an ineffective assistance of counsel claim presents a mixed question of fact and law. *State v. McDowell*, 2004 WI 70, ¶31, 272 Wis. 2d 488, 681 N.W.2d 500. An appellate court will not disturb the circuit

---

[2] *See State v. Machner*, 92 Wis. 2d 797, 804, 285 N.W.2d 905 (Ct. App. 1979).

court's findings of fact unless they are clearly erroneous, but determining whether counsel's performance falls below the constitutional minimum presents a question of law that is reviewed independently. *Id.*

¶7    To substantiate a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that counsel's errors were prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A court need not address both components of this inquiry if the defendant does not make a sufficient showing on one. *See id.* at 697.

¶8    To establish deficient performance, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. A defendant proves prejudice by demonstrating there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. However, "a defendant need not prove the outcome would 'more likely than not' be different in order to establish prejudice in ineffective assistance cases." *State v. Sholar*, 2018 WI 53, ¶44, 381 Wis. 2d 560, 912 N.W.2d 89 (citing *Strickland*, 466 U.S. at 693).

¶9    Pickens renews his postconviction argument that his trial counsel was ineffective by either eliciting or failing to challenge portions of trial testimony from two law enforcement officers, which Pickens contends were improper comments on the credibility of other witnesses, contrary to *State v. Haseltine*, 120 Wis. 2d 92, 96, 352 N.W.2d 673 (Ct. App. 1984). The *Haseltine* court held that

4

"[n]o witness, expert or otherwise, should be permitted to give an opinion that another mentally and physically competent witness is telling the truth." *Id.* The *Haseltine* rule is intended to prevent witnesses from interfering with the jury's role as fact finder and "lie detector in the courtroom." *Id.* (citation omitted).

¶10     First, Pickens argues that his trial counsel was ineffective by failing to object to statements made by Detective John Schira, who had interviewed Lewis—one of two individuals who attempted to restrain Pickens after Pickens failed to discharge his gun inside the bar. Lewis generally refused to answer the prosecutor's questions at trial. Lewis testified that he could not recall if he had ever been inside the bar, and he denied any memory of a police interview that night.

¶11     Detective Schira testified that although law enforcement did not reach out to Lewis, he "showed up in [the police station] lobby" to speak with them. Schira further testified that Lewis "gave what I believe to be a truthful statement, and I was able to, you know, to check his statement based off of the video that we had of inside the bar. So what he told me, you know, coincided with what I saw on the video." Schira added that Lewis was "forthcoming on what happened."

¶12     Pickens argues that Detective Schira's statements violated the *Haseltine* rule by vouching for Lewis's credibility. We are not persuaded. The *Haseltine* rule is not implicated when neither the purpose nor the effect of a witness's testimony is to attest to another witness's truthfulness. *See State v. Smith*, 170 Wis. 2d 701, 718, 490 N.W.2d 40 (Ct. App. 1992). In *Smith*, a detective told the jury that he did not initially believe an interrogation suspect, but that after continued questioning, the suspect changed his story to what the

detective "felt was the truth." *Id.* at 718-19. This court held that the purpose and effect of the detective's testimony was not to vouch for the witness's credibility but, rather, to explain the context and circumstances of the detective's investigation. *Id.* at 718.

¶13 Likewise, in *State v. Snider*, 2003 WI App 172, ¶¶25-27, 266 Wis. 2d 830, 668 N.W.2d 784, this court concluded it was not improper for a detective to testify that he believed the victim and did not believe the defendant during his investigation. The *Snider* court explained that, consistent with the holding in *Smith*, the detective "testified to what he believed at the time he was conducting the investigation, not whether [the defendant] or the victim was telling the truth at trial." *Snider*, 266 Wis. 2d 830, ¶27.

¶14 Here, like in *Smith* and *Snider*, Detective Schira was not vouching for Lewis's credibility at trial. Rather, he was merely explaining the context and circumstances of the investigation, which does not run afoul of *Haseltine*.

¶15 Moreover, Pickens' trial counsel acknowledged at the *Machner* hearing that he does not always object to testimony, even if he thinks it is inadmissible, because he does not want to highlight the testimony for the jury, which the circuit court determined was a "valid strategy." This court is "highly deferential to counsel's strategic decisions," such that "where a lower court determines that counsel had a reasonable trial strategy, the strategy 'is virtually unassailable in an ineffective assistance of counsel analysis.'" *State v. Breitzman*, 2017 WI 100, ¶65, 378 Wis. 2d 431, 904 N.W.2d 93 (citations omitted). Because Detective Schira's comments did not violate the *Haseltine* rule and counsel made a reasonable strategic decision not to object to the testimony, counsel was not deficient in this regard.

6

¶16    Next, Pickens argues that his trial counsel was ineffective by eliciting statements from Detective Yule that violated the *Haseltine* rule. Yule testified about his investigation of the incident, stating that he watched the surveillance video more than 100 times. Yule also testified that he met with Pickens on the afternoon after the incident and that Pickens initially told Yule he saw an individual with a gun inside the bar, he tried to stop the individual from using the gun, but he ultimately left without having taken the gun. Pickens' account was contrary to the video. According to Yule, Pickens further stated that he left the bar and was standing by Mitchell's car when he saw shots fired in the middle of the parking lot.

¶17    After Detective Yule informed Pickens that the incident was recorded, Pickens changed his story. Pickens admitted that it was Kareem who had the gun, and although Pickens admitted to handling the gun, he claimed he was trying to prevent Kareem from shooting it, which was also contrary to the video. Pickens also claimed that someone else displayed a second gun, which was not seen in the video nor corroborated by any witness. When Yule told Pickens that he still was not giving information consistent with the video, Pickens responded with a new story, this time stating that he "went somewhat out into the parking lot" before the shots were fired, but he did not have a gun and he was facing away from the shooter, again contrary to the video. Pickens' various stories were contrary to the video, which showed him pointing the gun at people both inside and outside the bar.

¶18    On cross-examination of Detective Yule, the following exchange occurred:

> Q You say that my client changed his statement many times. True?

A Yes.

Q Okay. At the end of the interview, did you have a good idea of what occurred in [the bar] from what my client had to say?

A Not from what he had to say. From the video I did.

Q *And so, in your opinion, you would say that he was trying to not be truthful with you?*

A *Correct.*

Q It's true, was it not, that he was in [the bar] that night. Right?

A Yes.

Q And it's true that his brother and [Tony] got into an altercation. Right?

A Yes.

Q And it's also true that his brother got cold-cocked by [Tony]. Correct?

A I guess I would use the term sucker-punched, but yes.

(Emphasis added.)

¶19    In context, neither the purpose nor the effect of Detective Yule's statement was to attest to Pickens' truthfulness at trial. Consistent with *Smith* and *Snider*, Yule's statement related only to his pretrial belief that Pickens was not truthful in his interview, and it had nothing to do with the truthfulness of any trial testimony. *See Smith*, 170 Wis. 2d at 718-19; *see also Snider*, 266 Wis. 2d 830, ¶27. Because the challenged testimony did not violate the *Haseltine* rule, counsel's performance was not deficient. *See Strickland*, 466 U.S. at 690.

¶20    Further, at the *Machner* hearing, Pickens' trial counsel explained that he deliberately asked Detective Yule whether Pickens was being truthful because he wanted to point out that while Yule said that he did not find the

statement truthful, there was, in fact, "a lot of truth" in Pickens' statement. As the circuit court recognized, defense counsel was not seeking improper opinion testimony from Yule. Rather, trial counsel was attempting to discredit Yule by first getting him to state that he did not think Pickens was being truthful, and then getting him to repeatedly admit that there was "a lot of truth" in what Pickens told him. This objectively reasonable trial strategy is virtually unassailable. *See Breitzman*, 378 Wis. 2d 431, ¶65.

¶21 Pickens argues that he is nevertheless entitled to a new trial because admission of the subject testimony amounted to plain error. We disagree. WISCONSIN STAT. § 901.03(4) (2021-22), recognizes the "plain error" doctrine, which allows appellate courts to review errors that were otherwise forfeited by a party's failure to object. *See State v. Lammers*, 2009 WI App 136, ¶12, 321 Wis. 2d 376, 773 N.W.2d 463. Plain error is "error so fundamental that a new trial or other relief must be granted even though the action was not objected to at the time." *Id.* (citation omitted). The error, however, must be "obvious and substantial," and courts should use the plain error doctrine sparingly. *Id.* There is no bright-line rule for what constitutes plain error. *Id.*, ¶13. Rather, the existence of plain error will turn on the facts of the particular case. *Id.* As discussed above, neither of the challenged statements violated the *Haseltine* rule; therefore, there was no error in their admission.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5. (2021-22).